IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

YOLANDA ASBERRY,                    §
                                    §
          Plaintiff,                §
                                    §
v.                                  §      CIVIL ACTION NO. H-07-4522
                                    §
MICHAEL J. ASTRUE,                  §
COMMISSIONER OF THE SOCIAL          §
SECURITY ADMINISTRATION,            §
                                    §
          Defendant.                §

<u>**MEMORANDUM OPINION**</u>

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 13) and Plaintiff's Motion for Summary Judgment (Docket Entry No. 15). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **GRANTS** Defendant's motion and **DENIES** Plaintiff's motion.

## I.  Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("SSA") regarding Plaintiff's claim for disability benefits under Title II of the Social Security Act ("the Act").

---

[1]    The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 11 and 12.

## A.  <u>Factual History</u>

Plaintiff was born on May 7, 1968, and was thirty-six years old on the date of the alleged onset of disability.[2]  Plaintiff earned a high school diploma.[3]  Prior to the alleged onset of her disability, Plaintiff worked as a teacher's assistant and as a truck driver.[4]  After the alleged onset of disability, Plaintiff claims, she was unable to continue working.[5]

On September 3, 2004, Plaintiff was involved in a motorcycle accident.[6]  Her medical records reflect that she suffered an open fracture to the right ankle, fractured bones in her left foot, a broken back, and a broken neck.[7]  X-rays showed no dangerous misalignment of the vertebrae in the back and neck.[8]  On September 5, 2004, Jeffrey J. Tucker, M.D., ("Dr. Tucker") washed out the ankle wound and inserted an external fixator (a series of pins and rods).[9]  He observed that it was "a very contaminated wound with mud and grass."[10]  Two days later, Dr. Tucker removed the fixator,

---

[2]     Transcript of the Administrative Proceedings ("Tr.") 20.

[3]     Tr. 412.

[4]     <u>See</u> Tr. 20.

[5]     Tr. 16, 413.

[6]     Tr. 16, 415.

[7]     <u>See</u> Tr. 16, 111, 203, 415.

[8]     Tr. 16.

[9]     Tr. 118.

[10]    <u>Id.</u>

2

dislocated Plaintiff's ankle, cleaned the wound, relocated the ankle, and replaced the fixator.[11]  The same procedure was performed two days later and then again two days after that, totaling four times in all.[12]  According to the record, Plaintiff suffered a postoperative wound infection of the right ankle and was placed on intravenous antibiotics.[13]  The record also indicates that she was progressively losing cartilage from her right ankle joint.[14]

On September 13, 2004, Emmanuel G. Melissinos, M.D., ("Dr. Melissinos") performed a successful skin graft procedure on Plaintiff's right ankle.[15]  On October 29, 2004, Dr. Tucker removed Plaintiff's ankle fixator and placed her in a short-leg cast.[16]  By December 2004, Plaintiff's ankle had developed a new displacement and an infection recurred in the form of a right ankle abscess.[17]  That month, Plaintiff underwent a series of procedures to clear up or remove the infected tissue.[18]  On December 21, 2004, William C. McGarvey, M.D., ("Dr. McGarvey") inserted another external

---

[11]    Tr. 116.

[12]    Tr. 111, 114.

[13]    Tr. 104.

[14]    Id.

[15]    Tr. 133.

[16]    Tr. 104.

[17]    Tr. 142, 144, 147.

[18]    Tr. 144, 310.

fixator.[19]   Later that month, x-rays showed that the ankle was correctly aligned.[20]

In January 2005, Dr. McGarvey reported that Plaintiff's ankle was almost completely healed and that she was no longer taking antibiotics.[21]   However, within the month, she developed chronic osteomyelitis (a bone infection caused by bacteria introduced during surgery or trauma) and osteopenia (a bone mineral deficiency) and was again placed on antibiotics.[22]   On February 17, 2005, Dr. McGarvey performed surgery to realign the fixator, clean the wound, and fuse the ankle.[23]   Five days later, an x-ray showed that the bones in her ankle were correctly aligned.[24]   On the same doctor visit, Dr. McGarvey confirmed the finding of osteopenia.[25] Two weeks later, he reported that Plaintiff's ankle looked great and was in great position.[26]   He also told her to try some gentle weight bearing.[27]

---

[19]     Tr. 303.

[20]     Tr. 299.

[21]     Tr. 293.

[22]     Tr. 242-43.

[23]     Tr. 259-60.

[24]     Tr. 240.

[25]     Id.

[26]     Tr. 230.

[27]     Id.

In early March 2005, Benjamin L. Portnoy, M.D. ("Dr. Portnoy"), an infectious disease specialist, diagnosed Plaintiff with new infections and recommended new antibiotics.[28]  A month later, Dr. McGarvey reported that her ankle looked good and was still healing, however, he noted a small draining sinus and ankle swelling.[29]  In June 2005, Dr. McGarvey noted that Plaitniff was no longer taking antibiotics and opined that Plaintiff's ankle was healing somewhat slower than before, but that she was able to bear weight completely on her right foot for short distances.[30]

In July 2005, Dr. McGarvey wrote a to-whom-it-may-concern letter saying that Plaintiff's injury and illness had prevented her from working until then and would limit her activities for some time to come.[31]  However, in August 2005, he reported in her chart that her wound was looking great and healing well and that he would be increasing her activities in the near future.[32]  One month later, he noted that she was out of her ankle brace and that her ankle displayed excellent alignment.[33]

---

[28]    Tr. 226.

[29]    Tr. 220.

[30]    Tr. 289.

[31]    Tr. 287.

[32]    Tr. 286.

[33]    Tr. 285.

In October 2005, Eric Lewis, M.D. ("Dr. Lewis") reported that Plaintiff had been walking with a boot.[34]  In an x-ray taken on October 28, 2005, Robert Scott Staewen, M.D. ("Dr. Staewen") found that Plaintiff's ankle displayed some, but not complete, fusion and that she was still suffering from chronic osteomyelitis and osteopenia.[35]  She was prescribed a single cane in November 2005.[36]  On February 21, 2006, Dr. McGarvey reported that Plaintiff's ankle was causing her significant pain and was swollen.[37]  Dr. McGarvey found the ankle to be well-aligned but also found bone fragments and some erosive changes at the tibiotalar joint.[38]  He noted that she had been walking with a boot up to two weeks prior to the onset of pain.[39]  Plaintiff was advised that her treatment options were either to manage symptoms as they arose, to eventually excise a problematic bone fragment, to resect a large portion of the ankle joint, or to amputate the joint.[40]  Plaintiff was prescribed a temporary handicap parking sticker.[41]

---

[34]    Tr. 372.

[35]    Tr. 284.

[36]    Tr. 339.

[37]    Tr. 278.

[38]    Id.

[39]    Id.

[40]    Id.

[41]    Tr. 366.

In a report dated July 11, 2006, Dr. McGarvey noted that Plaintiff was still on pain medication, had not required antibiotics for nearly a year, and was walking with a boot.[42] Her ankle joint was well-aligned, but non-union.[43] Her right leg was shorter than her left, resulting in a balance issue. Dr. McGarvey reported that he advised Plaintiff of three treatment options.[44] The first was to cast the ankle to allow more weight-bearing.[45] Another option was to stabilize Plaintiff's current limb length to provide stability with the possibility that any kind of metal implants or surgery would stimulate a dormant infection.[46] The most aggressive option was additional surgery to debride the ankle and leg, stabilize it with external fixators and stimulate healing.[47] Dr. McGarvey noted that Plaintiff stated that she would consider her options.[48]

In January 2007, Plaintiff reported continuous pain in her joint, rating it a seven out of ten.[49] Dr. McGarvey again discussed

---

[42]    Tr. 362.

[43]    Id.

[44]    Id.

[45]    Id.

[46]    Id.

[47]    Id.

[48]    Id.

[49]    Tr. 365.

Plaintiff's treatment options, including amputation, and Plaintiff was to call when she was ready to proceed with surgery.[50]

## B.   <u>Procedural History</u>

Plaintiff filed for disability benefits on October 15, 2004, just over a month after her motorcycle accident, projecting that she would be unable to work approximately a year after that accident.[51]   In connection with her ankle fracture, Plaintiff alleged chronic osteomyelitis,[52] osteopenia,[53] and emotional problems.[54]

In an undated pain report, Plaintiff described her pain as only stopping when she remained on her back without moving.[55]   She stated that her ankle swelled and hurt badly if it was not elevated.[56]   She described the pain as aching, stinging, and throbbing.[57]   She stated that she had trouble sleeping because the pain awoke her at night.[58]

---

[50]   <u>Id.</u>

[51]   Tr. 14.

[52]   Tr. 218, 243.

[53]   <u>Id.</u>

[54]   Tr. 278, 422.

[55]   Tr. 74.

[56]   <u>Id.</u>

[57]   <u>Id.</u>

[58]   Tr. 80.

In a Residual Functional Capacity ("RFC") assessment from January 13, 2005, a medical consultant determined that Plaintiff could occasionally lift and/or carry fifty pounds and frequently lift and/or carry twenty-five pounds.[59] It was found that she could sit for six hours of an eight-hour workday, that she could stand and/or walk for six hours of an eight-hour workday, and that she was not limited in pushing or pulling motions.[60] Also, it was determined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.[61] The medical consultant noted that, based on her physical impairments, Plaintiff's symptoms were disproportionately severe to what was expected.[62]

In a decision issued on February 23, 2005, Plaintiff's application was denied at the initial level of review because her condition was not expected to remain severe for twelve continuous months and because the residual effects of Plaintiff's condition would not prevent her from performing her previous job as a truck driver.[63] Plaintiff requested reconsideration of the decision and completed an amended disability report dated April 7, 2005.[64] On

---

[59]    Tr. 206.

[60]    Id.

[61]    Tr. 207-09.

[62]    Tr. 210.

[63]    Tr. 53.

[64]    Tr. 95.

9

that form, Plaintiff reported that she could only walk when using crutches and had to elevate her foot at all times.[65]  She also said that she could not cook, clean, or drive without help.[66]

On June 17, 2005, a medical consultant completed another RFC assessment.[67]  This time, it was determined that Plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds.[68]  It was found that she could sit for six hours of an eight-hour workday, that she could stand and/or walk for six hours of an eight-hour workday, and that she was not limited in pushing or pulling motions.[69]  The medical consultant found that Plaintiff occasionally had problems climbing, but had no manipulative, visual, communicative, or environmental limitations.[70]  It was noted that Plaintiff's limitations were supported by medical evidence in the file, but that her functioning would not be affected for twelve continuous months.[71]

On June 22, 2005, Plaintiff was again found not disabled due to the fact that her condition was not expected to remain severe

---

[65]     Tr. 92.

[66]     Id.

[67]     Tr. 273.

[68]     Tr. 267.

[69]     Id.

[70]     Tr. 268-70.

[71]     Tr. 271.

10

for twelve continuous months.[72]  In this denial, the SSA added that the residual effects of Plaintiff's condition would not prevent her from performing her previous job as a teaching assistant.[73]

After the denial on reconsideration, Plaintiff requested a hearing before an administrative law judge ("ALJ").[74]  The ALJ granted Plaintiff's request and conducted a hearing on May 1, 2007.[75]  At the hearing, Plaintiff and a vocational expert ("VE") testified.[76]

Plaintiff testified that she had prior employment as a teaching assistant and as a truck driver, but that she was currently unable to work because of injuries sustained in the motorcycle accident.[77]  She described her medical history and explained that she underwent ten or more surgeries in order to repair her ankle.[78]  Plaintiff reported that she took Norco, a pain medication.[79]  In addition to ankle pain, she continued, she also suffered from neck pain.[80]  She also explained that she felt fine

---

[72]     Tr. 46.

[73]     Id.

[74]     Tr. 41.

[75]     Tr. 405.

[76]     Tr. 406.

[77]     Tr. 414-15.

[78]     Tr. 416-21.

[79]     Tr. 422.  Norco is combination of acetaminophen and hydrocodone.  See www.drugs.com/norco.

[80]     Id.

11

mentally and was not taking medication for any kind of mental distress.[81]

Plaintiff testified that her daily activities included grocery shopping with assistance from her mother, watching television, listening to music, surfing the internet, and reading.[82] She was unable to drive and was limited in her movement.[83] She said that she occasionally cooked and she had recently visited her sister in Lamesa, Texas.[84] Plaintiff reported that she could not do chores and relied on her son to do them for her.[85] She estimated that she could sit with her foot elevated for an unlimited period of time, stand with a cane for about thirty minutes, walk half a block, and lift a gallon of water or juice.[86]

The VE classified Plaintiff's past work as a truck driver as medium and semi-skilled and her past work as teaching aid as light and semi-skilled.[87] He testified that a hypothetical person of Plaintiff's age, educational background, and job experience could not perform Plaintiff's past work given her current limitations.[88]

---

[81]    Tr. 422.

[82]    Tr. 18, 425-28.

[83]    Tr. 423-24, 429.

[84]    Tr. 427-28.

[85]    Tr. 426.

[86]    Tr. 423-24.

[87]    Tr. 436.

[88]    Id.

12

The VE opined that Plaintiff retained some transferable skills from her job as a truck driver, specifically, hand-eye coordination in manipulating objects and the ability to get along with others.[89] Regarding present abilities, he testified that a person with Plaintiff's skills and an ability to lift ten pounds occasionally and five pounds frequently could perform several light, semi-skilled jobs such as a gatekeeper or security position that involved patrolling in a golf cart.[90] Both positions were available regionally and nationally in sufficient numbers.[91] If Plaintiff had the ability to lift twenty pounds occasionally and to lift ten pounds frequently, her skill set would transfer to additional positions such as surveillance monitor, optical goods worker, and sorter.[92] These positions were widely available in the regional and national economies.[93]

On May 18, 2005, the ALJ issued his decision finding that Plaintiff met the requirements for insured status through December 31, 2008.[94] He found that she had not engaged in substantial gainful activity during the relevant time period and that she had a combination of impairments, the "residual effects of fracture and

---

[89]   Tr. 437.

[90]   Tr. 438.

[91]   Tr. 440.

[92]   Tr. 439.

[93]   Id.

[94]   Tr. 16.

surgical fixation of right ankle joint," that was severe.[95]  The ALJ determined that Plaintiff's impairments, singly or in combination, did not meet or equal any of the Listings.[96]

The ALJ found that Plaintiff retained an RFC to occasionally lift and/or carry ten pounds and frequently lift and/or carry less than ten pounds.[97]  He determined that she could sit for six hours, as long as she had the option to elevate her foot at will, and could walk four hours of an eight-hour day.[98]  He also found that Plaintiff did not retain the ability to climb or walk on uneven surfaces, but that she could push and pull with every extremity except her lower right.[99]  The ALJ ruled that Plaintiff could get along with others, understand complex instructions, concentrate, perform complex tasks, respond well to supervision and adapt to changes in the workplace.[100]

The ALJ determined that Plaintiff's testimony concerning the intensity, length, and limiting effects of her symptoms was not completely credible.[101]  He also assigned minimal weight to Dr. McGarvey's opinion that Plaintiff was disabled and unable to

---

[95]     Id.

[96]     Tr. 17.  "The Listings" refers to impairments listed in Appendix 1 of the SSA regulations.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

[97]     Tr. 18.

[98]     Id.

[99]     Id.

[100]     Id.

[101]     Tr. 19.

work.[102]  The ALJ found that Plaintiff was not able to perform any past relevant work, but that she had skills from past work that were transferable to jobs existing in significant numbers in the regional and national economy.[103]  The ALJ concluded by finding that Plaintiff had not been under a disability, as defined by the Act, during the relevant time period.[104]

On July 13, 2007, Plaintiff appealed the ALJ's decision.[105] The Appeals Council rejected her request for review, making the ALJ's decision the final decision of the SSA.[106]  Plaintiff appealed that decision on December 26, 2007.[107]

## II.  Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner denying disability benefits is limited to the determination of whether: 1) substantial evidence in the record supports the decision; and 2) the ALJ applied proper legal standards in evaluating the evidence.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002); Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).

## A.  Substantial Evidence

---

[102]    Tr. 20.

[103]    Tr. 20-21.

[104]    Id.

[105]    Tr. 9.

[106]    Tr. 5.

[107]    Plaintiff's Original Complaint, Docket Entry No. 1.

15

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." <u>Carey v. Apfel</u>, 230 F.3d 131, 135 (5th Cir. 2000).   It is "something more than a scintilla but less than a preponderance." <u>Id.</u>  The Commissioner has the responsibility of resolving any conflict in the evidence. <u>Id.</u>  If the findings of fact contained in the Commissioner's decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g); <u>Selders v. Sullivan</u>, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1998).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment. <u>Brown</u>, 192 F.3d at 496.   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   <u>Id.</u>

**B.  <u>Legal Standard</u>**

In order to obtain disability benefits, a claimant bears the ultimate burden of proving she is disabled within the meaning of the Act.   <u>Wren v. Sullivan</u>, 925 F.2d 123, 125 (5th Cir. 1991). Under the applicable legal standard, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason

16

of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a); see also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994). The existence of such a disabling impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic" findings. 42 U.S.C. §§ 423(d)(3), (d)(5)(A); see also Jones v. Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to an impairment listed in [the Listings] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform his previous work as a result of his impairment, then factors such as his age, education, past work experience, and [RFC] must be considered to determine whether he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 404.1520. By judicial practice, the claimant bears the burden of proof on the first four of the above steps, while the Commissioner bears it on the fifth. Crowley v. Apfel, 197 F.3d 194, 198 (5th Cir. 1999); Brown, 192 F.3d at 498. If the

Commissioner satisfies his step-five burden of proof, the burden
shifts back to the claimant to prove she cannot perform the work
suggested.  Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).
The analysis stops at any point in the process upon a finding that
the claimant is disabled or not disabled.  Greenspan, 38 F.3d at
236.

### III.  Analysis

Plaintiff requests judicial review of the ALJ's decision to
deny disability benefits.  She contends that the decision is not
supported by substantial evidence and that the ALJ did not follow
proper legal procedures.  Specifically, Plaintiff first argues that
she meets either of two Listings.  Second, she argues that the ALJ
erred by failing to obtain an updated medical expert opinion
concerning the medical equivalence of her impairments and therefore
failed to fully develop the administrative record.  Third, she
claims that the ALJ erred by not giving controlling weight to the
opinion her treating physician that she was disabled.  Fourth,
Plaintiff claims that the ALJ failed to consider certain evidence
favorable to her.  Finally, she argues that the ALJ erred by not
finding certain of her impairments to be severe.

### A.  **The Listings**

Plaintiff contends that the symptoms associated with her ankle
fracture meet the criteria for Listings 1.02(A) and/or 1.03.
Listing 1.02(A) directs a presumptive finding of disabled at step

three in the determination process if Plaintiff's impairment qualifies as follows:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b).

20 C.F.R. Pt. 404, Subpt. P, App. 1.   Listing 1.03 reads as follows: "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00(B)(2)(b), and return to effective ambulation did not occur, or is not expected to occur within 12 months of onset." Id.

To meet either Listing, Plaintiff must lack the ability to ambulate effectively. According to Social Security Regulations, to ambulate effectively Plaintiff "must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2). Ineffective ambulation is "the inability to walk without the use of a walker, two crutches or two canes." Id.

"For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment

that manifests only some of those criteria, no matter how severely, does not qualify." <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990). The ALJ is responsible for making the determination as to whether a severe impairment meets or equals a Listing.  Social Security Ruling 96-6p, 1996 WL 374180, at *1.

Here, the ALJ explicitly found that none of Plaintiff's impairments met any Listing, and this court finds his determination to be supported by substantial evidence.  Specifically, the ALJ found that Plaintiff did not meet either Listing 1.02(A) or 1.03 because of evidence inconsistent with an inability to ambulate effectively.[108]  The court finds it significant that in October 2005, Dr. Lewis reported that Plaintiff was walking with a boot,[109] and, one month later, she was prescribed a single cane.[110]  Also, twice in 2006, Dr. McGarvey reported that Plaintiff was walking with a boot.[111]  Furthermore, Plaintiff testified that she could walk half a block, stand for thirty minutes, and sit for long periods of time as long as she could elevate her foot.[112] Therefore, there is more than substantial evidence to support the ALJ's decision that Plaintiff did not meet either Listing 1.02(A) or 1.03.

---

[108]    Tr. 17.

[109]    Tr. 372.

[110]    Tr. 367.

[111]    Tr. 278, 362.

[112]    Tr. 423-24.

**B.  Lack of a Medical Expert**

Plaintiff next argues that the ALJ failed to fully and fairly develop the record when he failed to call an expert to testify to the medical equivalency of her combined impairments of surgical fixation of the right ankle joint, osteomyelitis, severe osteopenia, depression and anxiety.[113]  Also, although Plaintiff's argument on this point is less than clear, it appears that she argues that the ALJ's failure to call a medical expert violated SSR 96-6p because the ALJ considered medical records that post-dated the SSA's earlier RFC evaluation without the benefit of medical expert testimony.  The court first addresses the latter argument.

Social Security Ruling ("SSR") 96-6P explains when an ALJ must obtain an updated, or second, medical expert opinion on either medical equivalence or additional evidence.  See SSR 96-6p, 1996 WL 374180.  SSR 96-6p begins with the language, "An updated medical expert opinion must be obtained by the administrative law judge or the Appeals Council before a decision of disability based on medical equivalence can be made."  SSR 96-6p, 1996 WL 374180, at *1.  The ruling goes on to explain this requirement in further detail:

> When an [ALJ] or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any [L]isting, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents [Disability Determination and Transmittal form, and Cessation or Continuance of

---

[113]   Plaintiff's Motion for Summary Judgment, Docket Entry No. 15, p. 7.

> Disability or Blindness form] signed by a state agency
> psychological or medical consultant. However, an [ALJ]
> and the Appeals Council must obtain an updated medical
> opinion from a medical expert in the following
> circumstances:
>
> * When additional medical evidence is received that in
> the opinion of the [ALJ] or the Appeals Council may
> change the State agency medical or psychological
> consultant's finding that the impairment(s) is not
> equivalent in severity to any impairment in the Listing
> of impairments.

SSR 96-6p, 1996 WL 374180, at *3-4. In other words, SSR 96-6p

specifies that the ALJ must obtain updated expert testimony only

if, *in his opinion*, the new evidence might change the mind of the

state medical consultant. See SSR 96-6p, 1996 WL 374180, at *4.

The Eastern District of Louisiana was confronted with a

similar situation. In Tessitore v. Apfel, No. Civ.A. 97-2925, 1998

WL 564292, (E.D. La. Sept. 3, 1998)(unpublished), the plaintiff

argued that the ALJ failed to obtain a medical expert to render an

opinion on the issue of medical equivalency as required by relevant

Social Security rulings. Id. at *2. The court acknowledged the

circumstances set forth in SSR 96-6p that would require an updated

medical expert opinion, but clarified:

> The only "additional medical evidence" submitted by
> plaintiff to the ALJ, outlined in plaintiff's February
> 3, 1996 letter, showed only one diagnosis of anemia in
> 1995 without any indication of hematocrit . . . evidence
> of anemia in one examination absent a finding of
> hematocrit did not require the ALJ to obtain an updated
> medical opinion on equivalence.

Id. The Tessitore court concluded that there was substantial

evidence to support the opinion of the ALJ that the state medical

consultant would not have changed his findings based on the new evidence.

Here, the new evidence showed that Plaintiff was walking with a boot[114] and had been prescribed a single cane (rather than two canes or a walker).[115]  According to the regulations, if a person can walk with a single cane, she is ambulatory.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).  This evidence does not raise an issue of medical equivalence to the Listings requiring expert testimony.  Moreover, Plaintiff herself testified that she was able to walk half a block, stand for thirty minutes, and sit.[116]  By way of contrast, Plaintiff was not walking at all as of the date of the medical consultant's conclusion of non-disability in 2005.[117]  It was not error for the ALJ to have concluded that improvement in Plaintiff's ability to ambulate would only serve to reinforce, not change, the opinion of the state medical consultant.

The question of whether the ALJ fully and fairly developed the record depends on whether there was sufficient evidence in the record for an informed decision.  See Brock v. Chater, 84 F.3d 726, 728 (5th Cir. 1996).  As long as sufficient evidence does exist, the ALJ has no duty to request additional evidence.  See 20 C.F.R. §§ 404.1516; Anderson v. Sullivan, 887 F.2d 630, 634 (5th Cir. 1989).

---

[114]    Tr. 362, 372.

[115]    Tr. 367.

[116]    Tr. 423-24.

[117]    Tr. 16.

Reversal of the ALJ's decision is appropriate only if Plaintiff can show prejudice from the ALJ's failure to request additional evidence. <u>Newton</u>, 209 F.3d at 458. Prejudice can be established by "showing that additional evidence would have been produced if the ALJ had fully developed the record [ ] and that the additional evidence might have led to a different decision." <u>Id.</u>  Here, Plaintiff has failed to make any credible argument that additional medical testimony would have changed the decision made in this case.

### C.   <u>Weight Accorded to Treating Physician's Opinion</u>

Plaintiff also complains that the ALJ did not give her treating physician's opinion controlling weight.  Although not completely spelled out by Plaintiff, it appears that several documents form the basis for this argument.  On July 26, 2005, Dr. McGarvey wrote that Plaintiff was doing reasonably well and progressing but was unable to be employed in any capacity "during this time period."[118]  On November 1, 2005, Dr. McGarvey indicated on a medical assessment form that Plaintiff had no ability stand, walk, climb stairs, kneel, squat, bend, stoop, push, pull, lift or carry.[119]  On a March 7, 2006, Physical Residual Functional Capacity Questionnaire, Dr. McGarvey reported that Plaintiff had ankle pain with walking, frequent pain severe enough to interfere with

---

[118]    Tr. 287.

[119]    Tr. 274.

24

attention and concentration and was unable to walk one city block without rest or severe pain.[120]   He opined that Plaintiff was incapable of tolerating even a low stress job because of her emotional preoccupation with her condition.[121]   Dr. McGarvey also estimated that Plaintiff could sit no more than two hours, stand for no more than fifteen minutes and could sit and stand less than two hours per day.[122]

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." Newton v. Apfel, 209 F.3d 448, 455 (5th Cir. 2000) (internal quotation marks omitted).   Even though the opinion and diagnosis of a treating physician should be afforded considerable weight, "the ALJ has sole responsibility for determining a claimant's disability status." Martinez v. Chater, 64 F.3d 172, 176 (5th Cir. 1995) (quoting Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990)).   The ALJ ultimately may give less weight to the medical opinion of any physician when his statements are conclusory, unsupported, or otherwise incredible. Greenspan, 38 F.3d at 237.   However, "absent reliable medical evidence from a treating or examining physician controverting the claimant's

---

[120]   Tr. 320, 321.

[121]   Tr. 321.

[122]   Tr. 321, 322.

treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." <u>Newton</u>, 209 F.3d at 448.

In his decision, the ALJ related that:

> In his July 2006 office note, Dr. McGarvey reported that the claimant had been ambulatory with a walking boot and cane.  The claimant testified that she could sit for extended periods if her foot were elevated.  Also, the claimant made no mention of neck pain at the hearing, and the record contains no recent references to cervical spine difficulties and no subsequent x-rays or MRIs after her hospitalization.  Nevertheless, Dr. McGarvey wrote that the claimant's cervical spine range of motion was severely limited.  Additionally, the claimant's description of her daily activities indicates that she is able to remain mentally engaged in the world around her through newspapers and the internet, and indicates that her attention and concentration are not limited by her condition.[123]

The ALJ explained that, "Based on the fact that his opinion is inconsistent with the substantial evidence of record, and the opinion regarding her neck is unsupported, the undersigned assigns minimal weight to Dr. McGarvey's opinion regarding the claimant's functional capacity as expressed in his medical source statement."[124]

In this case, Plaintiff's contention that <u>Newton</u> required the ALJ to analyze Dr. McGarvey's assessment pursuant to 20 C.F.R. § 404.1527(d)(2) is incorrect because <u>Newton</u>'s analysis is designed

---

[123]    Tr. 20.

[124]    <u>Id.</u>

for cases in which the ALJ "summarily reject[s] the opinions of [a] treating physician, based only on the testimony of a non-specialty medical expert who has not examined the claimant."   Newton, 209 F.3d at 458.

In the present case, the ALJ fully considered the information provided by Dr. McGarvey and others, and adequately explained his rational for rejecting the doctor's legal conclusion that Plaintiff was disabled.   For example, Dr. McGarvey's March 2006 RFC assessment cited by Plaintiff is not entirely consistent with his later notations in Plaintiff's medical records.[125]   And, although Dr. McGarvey believed that Plaintiff suffered from emotional issues, Plaintiff's testimony on that point was less convincing.[126] Dr. McGarvey stated that Plaintiff was unable to stand more than fifteen minutes while Plaintiff estimated she was able to stand thirty minutes.   The ALJ credited his testimony that Plaintiff was unable to climb and push with her right extremity.[127]   Notably, the ALJ did not reject medical opinions of Dr. McGarvey; rather, the ALJ failed to credit Dr. McGarvey's estimation of Plaintiff's impairments in light of Plaintiff's own testimony and other medical records.

As it is the role of the ALJ to resolve evidentiary conflicts, the court will not substitute its judgment for his when the

---

[125]    Tr. 320-323, 362-64.

[126]    Tr. 278, 321, 422.

[127]    Tr. 19, 323.

decision is supported by substantial evidence and is founded in sound legal standards.  See Patton v. Schweiker, 697 F.2d 590, 592 (5th cir. 1983).  The court concludes that the ALJ did not err in discrediting portions of Dr. McGarvey's opinions concerning Plaintiff's abilities.

**E.  Failure to discuss evidence supporting Plaintiff's claim**

Plaintiff next claims that the ALJ failed to acknowledge certain evidence favorable to her claim of disability in his opinion.  She cites a long list of medical records which she claims were not considered by the ALJ.  However, an ALJ's failure to mention every notation in the medical record does not equate with a failure to consider the evidence, as long as the ALJ supports his decision with substantial evidence.  See Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007)(ALJ required to discuss evidence in support of a claim but not required to perform "an exhaustive point-by-point discussion").  Here, the ALJ cited more than enough evidence to support his finding of no disability.[128]  Additionally, he found Plaintiff's statements to be not entirely credible.[129]

Plaintiff argues that a significant amount of evidence, allegedly not considered by the ALJ, supports a finding of disabled.  Unfortunately, the issue is not how much evidence supports a finding of disability, but, rather, whether substantial

---

[128]    Tr. 362, 367, 372.

[129]    Tr. 19.

28

evidence supports the ALJ's finding that she was not disabled.  See
Brown, 192 F.3d at 496.  Without a doubt, these records include
some evidence that Plaintiff suffered from a high degree of
limitation and frequent pain.  Despite evidence of this sort, the
court finds more than a scintilla of evidence to support the ALJ's
conclusion that Plaintiff was not disabled.

    **F.**  **Severe Impairments**

Lastly, Plaintiff claims that the ALJ erred by finding her
osteomyelitis, osteopenia, anxiety, and depression not to be
severe.  A severe impairment is "any impairment or combination of
impairments which significantly limits [the claimant's] physical or
mental ability to do basic work activities."  Barnhart v. Thomas,
540 U.S. 20, 24 (2003); 20 C.F.R. § 404.1520(c).

When asked by the ALJ if there was anything wrong with her
mentally, Plaintiff said there was not.[130]  She said that she felt
fine, was coherent, and was not taking any medication for anxiety
or depression.[131]  Also, she said she was able to get along with
others.[132]  Therefore, substantial evidence supports the ALJ's
finding that Plaintiff's anxiety and depression were not severe.

With regard to the osteomyelitis and osteopenia, the ALJ
stated that "[t]he claimant has the following severe impairments:

---

[130]    Tr. 422.

[131]    Id.

[132]    Tr. 436.

residual effects of fracture and surgical fixation of right ankle joint." As the court understands the medical records, osteomyelitis and osteopenia resulted from the ankle fracture, the resulting infections, and Plaintiff's inability to bear weight on the ankle. Accordingly, the court interprets the ALJ's finding of a severe impairment to include osteomyelitis and osteopenia because they were residual effects of the fracture and surgeries of the right ankle. Because Plaintiff's osteomyelitis and ospeopenia were in fact found to be severe, her claim is without merit.

The court is sympathetic to the difficulties faced by Plaintiff; however, the ALJ is given the task of weighing the evidence and deciding disputes. See Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991). Because the court finds that the ALJ committed no legal error, and more than a scintilla of evidence exists in support of the ALJ's decision, that decision cannot be overturned.

### IV.  Conclusion

For all of the foregoing reasons, the court **GRANTS** Defendant's Motion for Summary Judgment and **DENIES** Plaintiff's Motion for Summary Judgment.

**SIGNED** in Houston, Texas, this __26th__ day of August, 2008.

Nancy K. Johnson
United States Magistrate Judge

30